United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GILEAD SCIENCES SECURITIES LITIGATION, <br><br>This Document Relates To:<br><br>ALL ACTIONS | No. C03-4999 MJJ<br>No. C03-5088 MJJ<br>No. C03-5113 MJJ<br>No. C03-5391 MJJ<br>No. C03-5592 MJJ<br>No. C03-5805 MJJ<br>No. C04-0100 MJJ |

**ORDER <u>GRANTING DEFENDANTS' 12(b)(6) MOTION TO DISMISS</u>**

**INTRODUCTION**

Before the Court is Gilead Sciences, Inc. ("Gilead"), John C. Martin, John F. Milligan, Mark L. Perry, Norbert W. Bischofberger, Anthony Carrociolo and William A. Lee's ("Defendants") Motion to Dismiss a federal securities fraud action brought against them by a class consisting of all purchasers of Gilead stock between July 14, 2003 and October 28, 2003.[1]  Defendants seek an order dismissing the Fourth Amended Class Action Complaint ("FAC") with prejudice under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  For the following reasons, the Court **GRANTS** Defendants' motion with prejudice.

///
///
///

---

[1] Docket No. 140, filed on December 22, 2005.

**BACKGROUND**

**A.  Factual History**

The FAC is brought on behalf of a class consisting of all persons who purchased or otherwise acquired Gilead stock between July 14, 2003 and October 28, 2003 (the "Class Period").  The allegations in the FAC relate to Gilead's announcement in July 2003 of its financial results for the second quarter of 2003, and the impact its premier product, Viread, had on those results.  Viread is a antiretroviral drug used to treat HIV/AIDS that Gilead introduced in 2001.  On July 14, 2003, the first day of the class period, Gilead issued a press release entitled "Gilead Sciences Expects Second Quarter 2003 Financial Results Will Exceed Expectations," and stating, "[t]he increase in revenue was driven primarily by strong sales growth of Viread."  The press release went on to say that Viread sales increased due to "broader prescribing patterns . . . as well as increases in U.S. wholesaler inventory in the second quarter."  On the same day, *Bloomberg News* identified Gilead spokeswoman Amy Flood as stating that "[t]he main reason for the jump in Viread sales is an increase in prescriptions, not inventory stocking."

Two weeks later, on July 31, 2003, Gilead issued a press release containing its final results for the second quarter.  Gilead announced that it had net revenues of $230.7 million for the second quarter, of which $167 million related to Viread.  Gilead went on:

> Viread sales growth was primarily driven by higher prescription volume, a significant increase in U.S. wholesaler inventories and a favorable European currency environment compared to the same quarter last year.  Gilead estimates that increased stocking by U.S. wholesalers accounted for $25-30 million in Viread sales in the second quarter.

The press release contained warnings regarding the forward-looking statements and stated that the statements were "subject to certain risks and uncertainties, which could cause actual results to differ materially."  Statements made during Gilead's earnings call of that same date, as well as on its Form 10-Q filed August 14, 2003, contained similar warnings.

Also on July 31, 2003, Gilead held a conference call with analysts and other investors regarding its financial results.  During the call, an officer of Gilead stated:

> Of significant note, we believe that a substantial inventory build occurred in U.S. distributor channel during the second quarter as wholesalers anticipated the Viread price increase announced on June 27th.  Though difficult to determine the exact figure for this inventory build, we estimate that wholesaler inventories increased by

2

> $25 to $30 million during the quarter . . . .  Based on the U.S. inventory build up seen in the second quarter, we anticipate Viread sales for the third quarter will be at or below the sales level recognized this second quarter. We expect these inventories to be drawn down to more normal levels during this quarter.

According to the FAC, market analysts–including Morgan Stanley, Prudential, and Bear Stearns–continued to predict strong demand for Viread in the third quarter of 2003 despite the inventory overstock.

On August 14, 2003, Gilead filed its Form 10-Q for the second quarter of 2003. This form confirmed the previously announced financial results. The Form 10-Q also discussed the inventory build-up: "We estimate that this higher stocking resulted in $25.0 to $30.0 million of additional sales during the second quarter, which may adversely impact sales in the third quarter as wholesalers return to more normal inventory levels and buying patterns." The Form 10-Q also disclosed the existence of a July 29, 2003 letter issued by the FDA warning Gilead about certain aspects of its promotional practices of Viread.[2]

In its October 28, 2003 Press Release, Gilead announced its financial results for the third quarter of 2003, Gilead announced net revenues of $194.1 million, and sales of Viread of $115.4 million. At that time, Gilead stated: "After reviewing NDC prescription trends, IMS inventory data and actual Viread sales, Gilead estimates there was approximately $33 to $37 million of inventory reduction by U.S. pharmaceutical wholesalers during the third quarter of 2003 following an equivalent inventory build during the second quarter of 2003." The next day, Gilead's stock dropped $7.46 per share from $59.46 per share to close at $52 per share. Approximately one month later, on December 2, 2003, Gilead's stock price had recovered the entire drop experienced on October 29 and closed at $59.83 per share.

Plaintiffs allege that for the period of at least September 2001 through, and subsequent to, the class period, Gilead engaged in the off-label marketing of Viread. Off-label marketing refers to the use for marketing purposes of information such as the result of clinical studies and other material on the uses of and the efficacy of an FDA-approved product that has not been approved by the FDA for

---

[2] Gilead initially made the FDA letter public on August 7, 2003.

3

inclusion in the product's package labeling. Pursuant to FDA guidelines, pharmaceutical manufacturers such as Gilead may only promote an FDA-approved drug consistent with the contents of its FDA-approved package labeling. Plaintiffs assert that the off-label marketing took three forms: 1) marketing to HIV patients co-infected with Hepatitis B virus ("HBV"); 2) marketing Viread as a first-line or initial therapy for HIV infection; and 3) marketing against Viread's safety profile.

Plaintiffs allege that Gilead's off-label marketing activities began as early as September 2001 at Gilead's national sales meeting in Miami. There, sales and marketing employees allegedly were given information regarding Gilead's submission of Viread clinical data and information to the FDA and, with a "wink and a nod," were instructed to use this information to sell Viread even though Viread had yet to be approved by the FDA. The FDA approved Viread in October 2001.[3] Later, employees allegedly were instructed, "overtly and covertly," at numerous regional and national sales meetings by Gilead executives to use off-label information to aggressively promote and sell Viread.[4] At these meetings, employees allegedly would be provided off-label information such as updates on clinical trials of Viread on large group meetings and then told in subsequent smaller meetings to use this information to sell Viread. Defendants Martin, Perry, Lee, Milligan, and Bischofberger allegedly attended one or more of these regional and national sales meetings.

According to the FAC, Gilead received an Untitled FDA Letter on March 14, 2002, advising the company that its representatives had made false and misleading oral promotional statements at the December 2001 Interscience Conference on Antimicrobial Agents and Chemotherapy conference. According to the Untitled FDA Letter, Gilead falsely and misleadingly promoted Viread by stating that it contained "no toxicities," was "extremely safe," and was "extremely well-tolerated," despite the fact that its boxed warning and Package Labeling advised to the contrary. The

---

[3] From October 2001 to August 2003, Viread's market share increased steadily from zero to nearly 20 percent.

[4] The FAC states that Plaintiffs' confidential witnesses (CW1 and CW2) attended various meetings at which Gilead's sales and marketing team received specific instructions to market Viread off-label. According to CW1, 85% to 95% of his Viread sales were a result of off-label marketing. Plaintiffs also allege that 85% to 90% of CW2's Viread sales were a result of off-label marketing.

4

Untitled FDA Letter further ordered Gilead to "immediately cease making such violative statements," and required Gilead to submit a written response describing its intent and plans to comply with the FDA's directives. Plaintiffs allege that the false statements were made by Defendant Martin and it was company-wide knowledge that Martin was the cause of the Untitled FDA Letter.

On March 21, 2002, Gilead responded saying that it was "commit[ted] to ensure that future violative statements are not made in the promotion of Viread." However, sixteen months later, on July 29, 2003, the FDA issued a second letter ("FDA Warning Letter") notifying Gilead that it considered certain oral representations made by a Gilead representative at a promotion booth during a conference call in April 2003 to be improper. This conference took place during Gilead's second fiscal quarter of 2003, just prior to Defendants' first class period announcement of outstanding Viread sales and financial results which exceeded market expectations.

This second FDA letter became public on August 7, 2003. According to the FAC, investors did not attribute much significance to the letter. (FAC at ¶191.) In response to the FDA letter on November 7, 2003, defendant Martin wrote a correction letter to the conference attendees.

Plaintiffs allege that Defendants provided so many off-label instructional materials and were so forceful in promoting off-label use, that 75% to 95% of Viread sales were attributable to off-label promotion. According to the FAC, this accounted for between $86.7 million and $109.82 million of Gilead's second quarter 2003 domestic Viread sales. (FAC at ¶150.) Plaintiffs allege that Defendants maintained this misleading image of Viread for a long enough period for the stock price to become inflated and for Defendants to sell their shares before the FDA made their second letter to Gilead public.

**B.    Procedural History**

On January 25, 2005, the Court dismissed Plaintiffs' Consolidated Amended Complaint ("CAC") with leave to amend, finding that Plaintiffs failed to establish the requisite connection between Gilead's off-label marketing activities and the allegedly false 2003 second quarter reports. Plaintiffs filed the Third Consolidated Amended Class Action Complaint ("TAC") on March 11,

5

1  2005.[5] On October 11, 2005 the Court dismissed Plaintiffs' TAC with leave to amend ("Order").
2  Once again the Court found Plaintiffs' pleadings deficient. Although the Court voiced its concerns
3  as to whether Plaintiffs adequately demonstrated that the off-label marketing scheme "materially"
4  affected Gilead's sales or stock price, it did not reach that issue on the merits. Instead the Court
5  found Plaintiffs' pleadings deficient because they failed to allege loss causation in light of *Dura*
6  *Pharmaceuticals, Inc. v. Broudo*, 125 S.Ct. 1627 (2005),[6] and *In re Daou Systems, Inc.*, 411 F.3d
7  1006 (9th Cir. 2005).[7] The Court held "in light of *Dura*, it is evident that Plaintiffs have not
8  adequately alleged proximate causation and economic loss with respect to Gilead's alleged off-label
9  marketing scheme." (Order at 12:21-23.) The Court ruled that "Plaintiffs [did] not allege that a
10 price drop immediately accompanied the disclosure of the FDA [W]arning [L]etter, and hence the
11 Court is left to speculate as to what portion of the eventual loss, if any, should be attributed to the
12 disclosure or whether the loss was caused by other factors." (Order at 12:23-26.) Plaintiffs filed the
13 FAC on December 2, 2005 in response to the Order.

## JUDICIAL NOTICE

In addition to the Motion to Dismiss the FAC, Defendants have filed a Request for Judicial Notice, and ask the Court to notice a number of documents. Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy can[]not reasonably be questioned." Plaintiffs do not object to the Court's taking judicial notice of the requested documents. The Court finds taking judicial notice of those documents and all other requested

---

[5] Plaintiffs filed their Second Consolidated Amended Class Action Complaint on February 25, 2005 (Docket No. 99), which they amended shortly thereafter with the TAC.

[6] The Supreme Court decided *Dura* after the Court dismissed the CAC. *Dura* held that in order to demonstrate loss causation, plaintiffs must establish an actual "causal connection" between the defendants' material misrepresentation and the economic loss suffered. *Dura*, 125 S.Ct. at 1631-33.

[7] The Ninth Circuit decided *Daou* after the Court dismissed the CAC as well. There, the Ninth Circuit held that a plaintiff sufficiently pleads "loss causation" by alleging that there was a steep drop in defendants' stock price upon revelation of previously undisclosed facts. *Daou*, 411 F.3d at 1026.

6

documents appropriate here. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *cert. denied*, 512 U.S. 1219 (1997); *In re Calpine Corp. Sec. Lit.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003). Accordingly, the Court takes notice of all such documents.[8]

## LEGAL STANDARDS

**A.  Rule 12(b)(6)**

A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for either lack of a cognizable legal theory or the pleading of insufficient facts under an adequate theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984). When deciding upon a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a court must take all of the material allegations in the plaintiff's complaint as true, and construe them in the light most favorable to the plaintiff. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Moreover, a complaint should not be dismissed unless the plaintiff could prove no set of facts in support of his claim that would entitle that plaintiff to relief. *Id.*

In the context of a motion to dismiss, review is limited to the contents of the complaint. *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 385 (9th Cir. 1995). When matters outside the pleading are presented to and accepted by the court, the motion to dismiss is converted into one for summary judgment. Where such a conversion takes place, all parties must be given an opportunity to present all material made pertinent to such a motion by Rule 56. *In re Pacific Gateway Exchange, Inc. Sec. Lit.*, 169 F. Supp. 2d 1160, 1164 (N.D. Cal. 2001); *see also* Fed. R. Civ. P. 12(b). However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss. *See Hal Roach Studies, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir.

---

[8]In its order dismissing the CAC the Court judicially noticed several of the documents for which Defendants ask for judicial notice in this motion to dismiss. (Amended Order Granting Defendants' 12(b)(6) Motion To Dismiss, 5:20-21.)

7

1989).

Where a plaintiff fails to attach to the complaint documents referred to in it, and upon which the complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support the plaintiff's claim. *See Pacific Gateway Exchange*, 169 F. Supp. 2d at 1164; *Branch*, 14 F.3d at 454. Thus, the district court may consider the full texts of documents that the complaint only quotes in part. *See In re Stac Electronics Sec. Lit.*, 89 F.3d 1399, 1405 n.4 (1996), *cert. denied*, 520 U.S. 1103 (1997). This rule precludes a plaintiff "from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which [the] claims are based." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998).

**B.    Section 10(b) And Rule 10b-5**

Section 10(b) of the Securities Exchange Act ("Act") provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce

(a)   to employ any device, scheme, or artifice to defraud;
(b)   to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
(c)   to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To be actionable under section 10(b) and Rule 10b-5, a plaintiff must allege 1) a misrepresentation or omission; 2) of material fact; 3) made with scienter; 4) on which the plaintiff justifiably relied; 5) that proximately caused the alleged loss. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). Additionally, as in all actions alleging fraud, plaintiffs must state with particularity the circumstances constituting fraud. Fed. R. Civ. P. 9(b).

**C.    Section 20(a)**

8

Section 20(a) of the Act provides derivative liability for those who control others found to be primarily liable under the Act. *In re Ramp Networks, Inc. Sec. Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.*

**D.     Private Securities Litigation Reform Act**

In 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-469, 104th Conf., 1st Sess. at 32 (1995) (Nov. 28, 1995). The PSLRA strengthened the pleading requirements of Rules 8(a) and 9(b). Actions based on allegations of material misstatements or omissions under the PSLRA must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The PSLRA also heightened the pleading threshold for causes of action brought under Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading scienter. A complaint under the PSLRA must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics, Inc. Sec. Lit.*, 183 F.3d 970, 974 (9th Cir. 1999). If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the defendant, the court must dismiss the complaint. *See* 15 U.S.C. § 78u-4(b)(1).

**ANALYSIS**

After the Court dismissed Plaintiffs' TAC for failure to adequately allege loss causation, Plaintiffs amended their complaint on December 2, 2005. Plaintiffs' amendments primarily consist of allegations that market analysts predicted an increase in Gilead's sales despite the overstock of

9

1 Viread.  Again, Plaintiffs rely on three types of allegations to support their Section 10(b) action:  1)
2 Defendants' statements and omissions regarding wholesaler overstocking; 2) the alleged financial
3 impact of the off-label marketing scheme; and 3) the individual Defendants' own stock sales.
4 Defendants move the Court to dismiss the FAC with prejudice pursuant to the PSLRA and Federal
5 Rules of Civil Procedure 9(b) and 12(b)(6), arguing that Plaintiffs fail to adequately plead loss
6 causation, falsity, and scienter.

**A.     Loss Causation**

Allegations of "loss causation" are a necessary element of a § 10(b) claim.  *Dura*, 125 S.Ct. at 1631.  Merely alleging that a misrepresentation caused an inflated purchase price does not, without more, demonstrate loss causation.  *Id.* at 1631-32.  It is insufficient for a misrepresentation to "touch upon" an economic loss; a plaintiff must demonstrate an actual "causal connection" between the defendant's material misrepresentation and the economic loss suffered.  *Id.* at 1632.  In other words, "to prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff."  *Daou*, 411 F.3d at 1025.

Defendants argue that Plaintiffs still have not established a "causal connection" between the disclosure of the FDA's warning letter (containing the off-label marketing allegations) and the drop in Gilead's stock price.  Defendants contend that the additional information provided in the FAC has added little to Plaintiffs' previous complaint, which insufficiently pled loss causation.

In support of their position, Plaintiffs point to the following allegations from the FAC:  1) Defendants' alleged off-label marketing caused increased prescriptions and sales, which caused legitimate demand due to "explosive growth"; 2) Defendants' scheme was followed by the FDA Warning Letter forbidding Gilead from engaging in off-label marketing; and 3) this letter caused a slow down in demand for Viread, which in turn caused a slow down in sales, resulting in a stock price decline.  According to Plaintiffs, the resulting slow down in sales and consequential stock decline was "foreseeable and well within the 'zone of risk' concealed by Defendants'[off-label marketing]."  (Plaintiffs' Corrected Memorandum of Points and Authorities in Opposition to

10

Motion to Dismiss FAC at 17:17.)

As the Court found in its previous order, Plaintiffs' allegations regarding loss causation are simply too attenuated. Plaintiffs continue to allege that the disclosure of the August 8, 2003 FDA Warning Letter coupled with the announcement of disappointing sales in the October 28, 2003 Press Release shocked investors and caused the price of Gilead stock to drop.[9] To satisfy the loss-causation requirement, Plaintiffs must allege that the material misrepresentation caused their loss. The fundamental problem with Plaintiffs' allegations is that they require the Court to make the unreasonable inference that a public revelation on August 8 *caused* a price drop *three months later* on October 28. There was no price drop immediately after the August 8 revelation. The new allegations in Plaintiffs' FAC merely reinforce the Court's finding regarding the reasonableness of this inference and do little to meet their loss causation pleading burden.

Several of Plaintiffs' new allegations require the Court to make unwarranted inferences that the FDA Warning Letter was the cause of the lower demand for Viread. Plaintiffs attempt to support these allegations with citations to general conclusions in market analyst reports by Morgan Stanley, Prudential, and Bear Stearns. Neither the new allegations nor the market analyst reports help Plaintiffs' loss causation claim. First, Plaintiffs' assertion that the FDA Warning Letter was the cause of the lower demand for Viread still does not establish a causal connection. Even if the FDA Warning Letter caused practitioners to reduce their Viread supply, Plaintiffs still fail to connect that with the drop in stock price.

Additionally, the Court finds the market analyst reports problematic because they undermine Plaintiffs' theory that the disclosure led to a decrease in demand. The reports do not predict a decrease in demand at all. Indeed, they suggest that the demand for Viread would continue to grow. (Defendants' Motion to Dismiss FAC at Ex. G.) Further, the reports simply restated what Gilead had already stated in its October 28, 2003 Press Release – that Viread would expect lower end-user

---

[9] The Court noted in its Order that "this argument is flawed because the record reflects that investors never actually learned the extent of Defendants' off-label marketing scheme." (Order Granting Motion to Dismiss at 12:18-19, Doc. No. 136).

11

1 demand during the third quarter due to higher than normal inventories entering that quarter.
2 (Defendants' Motion to Dismiss FAC at Ex. G, I.) Thus, the Court finds that the market analyst
3 reports do not shed any new light on the loss causation issue.[10]

4 Plaintiffs correctly argue that the heightened pleading standard does not apply to allegations
5 that Defendants' misrepresentations caused their loss. *Dura,* 125 S.Ct at 1633-34. However,
6 Plaintiffs reliance on *In re Parmalat Sec. Litigation*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005), and
7 *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 U.S. Dist. LEXIS 19506
8 (S.D.N.Y. Sept. 6, 2005), to support the proposition that merely alleging a corrective disclosure
9 followed by a decline in stock price is sufficient to plead loss causation, is misplaced. The Court
10 finds this case distinguishable from *Parmalat* and *Teamsters* as the price drop in those cases
11 occurred soon after the revelation of the misrepresentation.[11] *Parmalat* involved a drop in securities
12 price after disclosure of a fraud that understated Parmalat's debt by virtually $10 billion and
13 overstated the corporation's assets by over $16 billion. *Parmalat*, 375 F. Supp. 2d at 282. To
14 support their allegations of securities fraud, the plaintiffs alleged that the company's auditor,
15 Deloitte, issued two financial reports with the understated debts and overstated assets. *Id.* at 307.
16 About eighteen months later, Parmalat was unable to repay its bonds when they became due and
17 publicly disclosed that a $4.9 billion bank account it supposedly held did not exist. *Id.* at 284. This
18 was immediately followed by a drop in stock price. *Id.* at 307. There the district court found the
19 plaintiffs adequately pled loss causation because the "[d]efendants reasonably could have foreseen
20 that Parmalat's inability to service its debt would lead to a financial collapse." *Id.*

21 Similarly, the plaintiff in *Teamsters* alleged senior management of Bombardier Capital Inc.
22 ("BCI"), a manufactured housing asset-backed company, disregarded the companies' underwriting
23 standards in favor of high-risk loans. *Teamsters*, 2005 U.S. Dist. LEXIS 19506, at *7. BCI did not
24 disclose on its Form 8-K filing or otherwise its actual underwriting practices and thus concealed the

---

[10] Defendants concede the demand for Viread did not increase at the same rate in the third quarter. The Court, however, finds a slowing increase in demand, alone, too speculative to adequately demonstrate loss causation.

[11] The Court has reviewed the other cases to which Plaintiffs cite and finds them equally distinguishable.

12

high-risk loans. *Id.* at *6. The high-risk loans turned into "bad loans" and resulted in a sharp increase in delinquencies and foreclosure on BCI assets. *Id.* at *8. As a result, BCI's stock certificates suffered a price decrease of 38% in less than three months. *Id.* at *7. There the district court found the plaintiff adequately alleged loss causation:

> Plaintiff has alleged that its loss was caused when a risk that was concealed by the defendants materialized in a foreseeable chain of events. The Complaint alleges that defendants' misrepresentations regarding rigorous underwriting concealed the fact that the collateral pool contained a substantial number of high risk loans. The concealed risk materialized when the collateral pool experienced high delinquency rates and repossession on a sustained basis. Not surprisingly, BCI's earnings expectations then fell. BCI announced that it would write off the losses, rating agencies downgraded the Certificates, and the value of plaintiff's investment declined. These allegations are sufficient to plead loss causation.

*Id.* at *57.

The case before the Court, however, is substantially different. Both *Parmalat* and *Teamsters* involved the omission and subsequent disclosure of substantial corporate debt that clearly related to the decline in stock value. A fundamental principle of causation is "that the injury averred must proceed directly from the wrong alleged and must not be attributable to some supervening cause."[12] *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716-17 (2d Cir. 1980) (Meskill, J., dissenting). It is worth reiterating that the FDA letter became public on August 7, 2003, and the loss which that revelation allegedly caused occurred nearly *three months* later on October 29, 2003. Consequently, the Court is left to speculate as to what portion, if any, of that decrease should be attributed to the alleged misconduct and what should be attributed to other market factors. A court need not indulge unwarranted inferences in determining whether a plaintiff has adequately pled a necessary element. *In re Verifone Sec. Lit.,* 11 F.3d 865, 868 (9th Cir. 1993). Even viewed in the light most favorable to

---

[12] There are too many logical and factual gaps in Plaintiffs' allegations to support the conclusion that Defendants' alleged misconduct proximately caused Gilead's stock decrease in October. *Dura*, 125 S.Ct. at 1632. The FAC does not connect the following chain of events, which it must for Plaintiffs to adequately plead loss causation: 1) that Defendants' alleged failure to disclose the off-label marketing scheme caused a material increase in sales; 2) that practitioners materially decreased their demand for Viread due to the publication of the FDA Warning Letter; and most importantly, 3) that the alleged decrease in sales due to the FDA letter proximately caused Gilead's stock to decrease three months later

13

Plaintiffs,[13] the Court finds that Plaintiffs have not adequately pled, under *Dura,* that the alleged misrepresentation proximately caused their loss.[14]  Accordingly, the Court must dismiss the Complaint.[15]

## B.     Rule 20(a) Liability

Section 20(a) of the Securities Exchange Act provides derivative liability for those who control others found to be primarily liable under the Act.  *In re Ramp Networks, Inc. Sec. Lit.*, 201 F. Supp. 2d at 1063.  Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same.  *Id.*  Because Plaintiffs have failed to adequately plead the underlying 10b-5 violation, the Section 20(a) claims must be dismissed against the individual Defendants as well.

## C.     Dismissal With Prejudice

A court considers five factors in determining whether to dismiss a complaint with prejudice: 1) bad faith, 2) undue delay, 3) prejudice to the opposing party, 4) futility of the amendment, and 5) whether plaintiff has previously amended his complaint.  *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990).  A court's "discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint."  *Id.* (quoting *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989)).

Plaintiffs have filed four amended complaints, and this is the third complaint that the Court has dismissed.  The Court found that Plaintiffs failed to allege with the requisite detail, falsity and scienter, when it dismissed Plaintiffs' CAC with leave to amend.  The Court dismissed the TAC for

---

[13] The Court must consider all reasonable inferences to be drawn from the allegations, "including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir. 2002).

[14] The Court distinguishes this case from *Daou*.  In *Daou*, the defendants fraudulently inflated their stock price through accounting methods which violated Generally Accepted Accounting Practices.  *Daou*, 411 F.3d at 1012.  There, the Ninth Circuit found loss causation because plaintiffs alleged a steep drop in stock price following disclosure of Defendants' "true financial health."  *Id.* at 1026.  Here, however, Plaintiffs have not adequately connected the disclosure of Gilead's off-label marketing and the drop in stock price in the FAC.  Indeed, the evidence Plaintiffs have presented to the Court only supports an inference that the market gave little or no weight to the FDA Warning Letter.

[15] Because Plaintiffs have not adequately alleged loss causation, the Court need not consider whether Plaintiffs have adequately alleged falsity or scienter.

14

failure to adequately plead loss causation, but it reiterated its concerns regarding the sufficiency of Plaintiffs' falsity and scienter allegations. Because *Daou* was decided after Plaintiffs filed their TAC, the Court again granted leave to amend with respect to the issue of loss causation. Yet Plaintiffs still have not adequately alleged loss causation after having had another opportunity to do so. Since Plaintiffs have failed to remedy the deficiencies of their allegations in each amended version, the Court finds that further amendment is futile. Accordingly, the Court **DISMISSES** the Complaint **with prejudice**.

## CONCLUSION

After consideration of the FAC in light of *Dura* and the requirements of Federal Rule of Civil Procedure 12(b)(6), the Court **GRANTS** Defendants' 12(b)(6) Motion to Dismiss the FAC with prejudice.[16] The Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: May 12, 2006

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

---

[16] Docket No. 140, filed December 22, 2005.

15