United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GILEAD SCIENCES SECURITIES LITIGATION | No. C 03-4999 SI<br>No. C 03-5088 SI<br>No. C 03-5113 SI<br>No. C 03-5391 SI<br>No. C 03-5592 SI<br>No. C 03-5805 SI<br>No. C 04-0100 SI |
| This document relates to:<br>ALL ACTIONS. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS FIFTH AMENDED COMPLAINT** |

On October 9, 2009, the Court held a hearing on defendants' motion to dismiss the fifth consolidated amended class action complaint. For the reasons set forth below, the Court GRANTS in part and DENIES in part the motion. Defendants shall file an answer within 20 days of the filing date of this order. The Court will hold a case management conference on **January 22, 2010** at 3:00 pm.

**DISCUSSION**

Defendants move to dismiss the fifth consolidated amended complaint on three grounds. First, defendants contend that plaintiffs have not cured the deficiency identified by the Court in the previous complaint, namely that the complaint did not adequately allege significant sales of Viread resulting from improper off-label marketing during the class period. Second, defendants contend that the complaint should be dismissed as to defendants Perry, Bischofberger, Carraciolo, and Lee because these individuals are not primary violators of Section 10(b) of the Exchange Act. Third, defendants move to

dismiss plaintiffs' claim under Section 20(a) of the Exchange Act on the ground that plaintiffs have not alleged a basis for control person liability.

In the June 3, 2009 order dismissing the fourth amended consolidated complaint ("FAC"), the Court held that plaintiffs' allegations of off-label sales during the class period, which were based primarily on two confidential witnesses (CW1 and CW2), were inadequate. The Court held that CW1's allegations as to sales during the class period were unreliable because CW1 did not work at the company during the class period. The Court held that CW2's allegations were unreliable because although the FAC alleged that CW2 estimated that 85%-90% of his or her sales were the result of off-label marketing, a previous version of the complaint alleged that "despite his or her superiors' pressure to market Viread using off-label materials, CW2 refused." CAC ¶ 50. The Court granted plaintiffs leave to amend to add further support to allegations of off-label sales during the class period, and instructed that "Plaintiffs may cure this deficiency by adding additional confidential witnesses who allege that there were off-label sales of Viread during the class period, and/or by providing an explanation of the change in CW2's allegations on this point." June 3, 2009 Order at 5:15-17.

The fifth amended consolidated complaint adds 6 new confidential witnesses, and also provides an explanation as to the change in CW2's allegations. With regard to CW2, the complaint states,

> In Plaintiffs' Consolidated Amended Class Action Complaint . . . it was alleged that CW2 refused his/her "superiors' ever-increasing pressure to market Viread utilizing off-label materials" and "terminated his or her employment rather than follow these questionable directives to use off-label materials." CAC at ¶ 50. This allegation incorrectly implied that CW2 never promoted or sold Viread with off-label information. Subsequent to this Court's January 26, 2002 Order [DE #98] dismissing without prejudice the CAC, as part of Plaintiffs' ongoing investigation, CW2 continued to describe her/his experiences at Gilead. During this time, CW2 clarified what she/he meant by CW2's "refusal" to bow to her/his superiors' ever-increasing pressure to market Viread with off-label information, and stated that she/he had no choice but to engage in off-label marketing while at Gilead. CW2, however, was never comfortable doing so because CW2 knew off-label marketing was illegal. Gilead management and CW2's superiors, however, pressured CW2 to utilize more and additional off-label materials. Put simply, CW2 was told she/he was not being aggressive enough with her/his use of off-label information to sell Viread and had to do more. Rather than kowtow to this additional pressure, CW2 left the company. Thus, when CW2 stated that she/he refused to bow to "ever-increasing pressure" to market Viread using off-label information, CW2 did not mean that she/he never used off-label information, but that she/he refused to increase her/his use of off-label information to sell Viread. Viewed in this light, allegations attributed to CW2 in the CAC and the Fourth Amended Consolidated Complaint (FAC") are not contradictory. If anything, the original allegations in the CAC were inartfully drafted. To the extent the Court concludes they are conflicting, however, CW2's last word to Plaintiffs' counsel regarding sales of

Viread and the reason why she/he left Gilead is reflected in the allegations of the FAC. Fifth Amended Consolidated Compl. ¶ 48 n.1.

## I. Confidential witness allegations about off-market sales of Viread during class period

Defendants contend that the complaint still does not adequately allege significant off-market sales of Viread during the class period. With regard to CW2, defendants argue that plaintiffs' explanation of the change in allegations from the CAC to the FAC is unpersuasive because it is "inexplicable how CW2 could claim that 90 percent of his/her sales were the result of off-label marketing and simultaneously claim that he/she left Gilead rather than succumb to pressure to increase his/her off-label marketing sales." Motion at 12:6-9. With regard to the six new CWs, defendants argue that their allegations of off-market sales during the class period are conclusory, based on hearsay, vague as to time, and internally inconsistent.

The Court has reviewed the allegations of the fifth amended consolidated complaint and finds that, taken as a whole, the complaint sufficiently alleges that defendants engaged in significant off-market sales of Viread during the class period. The Court finds that the amended complaint's explanation of the change in CW2's allegations between the CAC and the FAC is plausible, and thus the Court is satisfied with CW2's allegations as a pleading matter. Defendants argue that the explanation is not "persuasive." However, while the Court must determine that confidential witness allegations are reliable as required by *Zucco Partners, LLC v. Digimarc Corporation*, 552 F.3d 981 (9th Cir. 2009), the Court does not find it appropriate to engage in a more searching assessment of CW2's credibility at this stage of the litigation.

Moreover, CW2's allegations of off-market sales of Viread during the class period are now buttressed by the allegations of CW3-CW8. For example, CW3 worked at Gilead from 2000 until 2002 as a Therapeutic Specialist, and from 2002 to 2005 as a Training Manager in Gilead's Foster City, California headquarters where he/she reported to the company's vice President of U.S. sales, Meyers. Fifth Am. Compl. ¶ 50. Throughout the class period (July 14, 2003 - October 28, 2003), CW3 was responsible, in his/her capacity as a Training Manager, for developing company-wide training materials for all of Gilead's sales representatives. *Id.* ¶¶ 50, 53. The complaint alleges, *inter alia*, that CW3

3

recalled that off-label information and data was used by Therapeutic Specialists in sales calls throughout CW3's tenure, that materials were presented and distributed to the company's sales force at Gilead's national and regional sales meetings, and that these materials contained facts about off-label uses of Viread. *Id.* ¶ 52. The complaint also alleges,

> CW3 stated that because Gilead's marketing department could not directly tell the sales force to market off-label, Gilead used the training department to deliver marketing's message. The result was that Gilead HIV Therapeutic Specialist training materials, including throughout the Class Period, contained a great deal of off-label information, and these training materials were provided to the Company's sales force specifically for use as talking points with the doctors on which they called. In addition, Meyers directed CW3 to write training materials for the Therapeutic Specialists that contained bullet points layered not only with FDA-approved data, but also with unapproved, off-label data and information. As a result, the Company's sales force was deliberating being trained and encouraged – from the highest levels – to engage their existing and potential clients in off-label discussion regarding Viread using information in the documents they received from the Company. Put simply, the internal Company strategy to sell Viread relied extensively on off-label information and data.

*Id.* ¶ 53. The complaint alleges from 2002 to 2005, CW3 attended weekly internal Gilead meetings to discuss the provision of off-label material to the company's HIV sales force, and that the attendees at the meetings included the marketing and training department heads, the sales directors, and Meyers. *Id.* ¶ 54. "The result of the meetings was that Meyers supported the notion that Therapeutic Specialists should receive off-label marketing materials, and directed the provision of such materials to be accomplished through the Company's training department." *Id.* CW3 also stated that sales of Viread for use by treatment naive patients[1] (an off-label use) represented a "large portion" of Viread sales before and during the Class Period, which resulted from Gilead's off-label promotion of Viread for such purposes. *Id.* ¶ 52. The complaint contains similar allegations about the other new CWs.

Contrary to defendants' assertions, these allegations are not conclusory or speculative. CW3's job description and responsibilities are described with particularity, and the allegations "support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Systems, Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (internal citation and quotations omitted). These allegations, combined with CW2's allegation that 85%-90% of his/her sales of Viread were off-

---

[1] The complaint defines "treatment naive" patients as those recently infected with HIV and not yet exposed to a diverse treatment program. *Id.* ¶ 45. "Treatment naive" patients are differentiated from treatment "experienced" (patients previously treated with other HIV drugs) and "salvage" (patients with long-term HIV infection) patients.

4

label during the class period, in addition to the other new CW allegations regarding off-label sales and off-label training and marketing, are more than adequate to meet the PSLRA pleading standards. *See Tellabs, Inc. v. Makor Issues & Rights, Inc.,* 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007) ( "The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.") (emphasis in origina); *see also Zucco Partners*, 552 F.3d at 992 (enunciating "holistic" review standard after *Tellabs*).

## II. Individual defendants[2]

### A. 10(b) claim

Defendants move to dismiss the "non-speaking" defendants – Perry, Bischofberger, Carraciolo, and Lee – because the complaint does not allege that any of these defendants made a false statement or substantially participated in the preparation of false statements.[3] In order to state a claim under section 10(b), plaintiffs must allege either that the defendant made a public statement or omission that was misleading to investors, or that the defendant personally committed a manipulative act that deceived investors. *See Central Bank of Denver, NA v. First Interstate Bank of Denver, NA*, 511 U.S. 164, 177 (1994); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000) ("[W]e have held that substantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actual making of the statements."). There is no liability for aiding and abetting under section 10(b). *Central Bank*, 511 U.S. at 177. Defendants contend that the non-speaking defendants should be dismissed because they did not make any statements and did not sign any statements, nor does the complaint contain any specific allegations regarding the involvement or participation, if any, of any of these defendants in preparing Gilead's financial statements or press releases.

---

[2] Plaintiffs object that defendants are foreclosed from raising arguments about the individual defendants because the Court's previous order held that the complaint was sufficient as to the defendants. However, the Court did not address the specific contentions that defendants raise now, and thus the Court will consider these arguments.

[3] The complaint alleges that during the class period, Perry was the company's Executive Vice-President, Operations; Bischofberger was the Executive Vice-President, Research and Development; Carraciolo was the Vice-President; and Lee was the Senior Vice-President, Research.

The only allegation in the complaint is a general one that "The individual defendants were involved in drafting, producing, reviewing, and/or disseminating the materially false and misleading statements complained of herein. The Individual defendants were aware (or disregarded with deliberate recklessness) that materially false and misleading statements were being issued regarding the Company and nevertheless approved, ratified, and/or failed to correct those statements, in violation of the federal securities laws." Fifth Am. Compl. ¶ 29. The complaint also relies on the "group publishing doctrine," which is a pre-PSLRA presumption that allows company statements to be attributed collectively to its officers and directors. Citing cases from the Third, Fifth and Seventh Circuits, as well as district courts within the Ninth Circuit, defendants contend that the Court should reject the group publishing doctrine as inconsistent with the PSLRA. *See, e.g., Winer Family Trust v. Queen*, 503 F.3d 319, 334-37 (3d Cir. 2007); *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006), *rev'd on other grounds*, 551 U.S. 308 (2007).

In response, plaintiffs rely on *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corporation*, 320 F.3d 920 (9th Cir. 2003), to contend that the non-speaking defendants can be held liable under section 10(b) because they have engaged in insider trading.[4] In *America West*, the Ninth Circuit held that the fact that various individuals did not make "any of the allegedly misleading statements does not shield them from liability" because "[i]ndividuals or corporations that engage in insider trading can be held liable under Section 10(b) and Rule 10b-5." *Id.* at 937. Defendants contend that *America West* is not good law because the court did not address the Supreme Court's decision in *Central Bank*. However, the Court need not resolve the question of whether a defendant may be held liable under section 10(b) based solely on insider trading because, as plaintiffs conceded at the hearing, the complaint does not allege that defendants engaged in insider trading. The "Summary and Overview" section of the fifth amended complaint alleges that "[e]ach of

---

[4] It appears that plaintiffs have abandoned the group publishing doctrine as a basis for holding the individual defendants liable. The opposition does not rely on this theory, and at the hearing plaintiffs' counsel stated that they seek to hold the individual defendants liable based on insider trading allegations and *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corporation*, 320 F.3d 920 (9th Cir. 2003). Accordingly, the Court finds it unnecessary to discuss the viability of the group publishing doctrine after the PSLRA.

6

the defendants is liable as a primary violator in making false and misleading statements . . . ." without any allegation about insider trading. Fifth Am. Compl. ¶ 31. The only section addressing class period sales by defendants is labeled "Additional Scienter Allegations," and the first paragraph of that section states "Defendants acted with scienter in that they knew or disregarded with deliberate recklessness that the public documents and statements . . . were materially false and misleading." *Id*. ¶ 269. There are no claims for insider trading in the complaint. Moreover, the Court finds it significant that in dismissing the CAC, Judge Jenkins held that the timing of defendants' stock sales was not suspicious. Docket No. 98 at 14:4-17 (holding that individual defendants' stock sales was not suspicious and therefore did not support scienter). Accordingly, the Court concludes that plaintiffs have not alleged a basis for holding the non-speaking defendants liable under section 10-b, and GRANTS defendants motion to dismiss these defendants without leave to amend.

### B.   20(a) claim

Defendants also contend that all of the individual defendants (the four "non-speaking" defendants, plus John Martin, the President and CEO, and John Milligan, the CFO and Senior Vice-President) should be dismissed because the complaint does not adequately allege control person liability. Defendants argue that the complaint lumps all of the individual defendants together and simply collectively alleges that "the Individual Defendants were able to, and did, control the contents of the Company's SEC filings." Fifth Am. Compl. ¶ 30.

Plaintiffs respond that the complaint adequately alleges a primary violation under section 10(b), and that the complaint's allegations setting forth each of the individual defendant's positions and describing their significance is sufficient to allege control person liability. *See, e.g. id*. at ¶¶ 296-97 (alleging that "By virtue of their high-level positions within the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's fraudulent marketing and promotions and actual performance, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading."). Plaintiffs also argue that "[w]hether the defendant is a controlling person

7

is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions," and thus that these determinations are inappropriate at the pleading stage. *Everex Sys.*, 228 F.3d at 1065.

Although it is a close call, the Court finds that the complaint sufficiently alleges control person liability as to all of the individual defendants. The complaint alleges a company-wide strategy of marketing Viread for off-label purposes, and alleges that there was a corporate culture that encouraged and facilitated off-label marketing and sales. As a pleading matter, these allegations are adequate.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part defendants' motion to dismiss the fifth consolidated amended complaint. (Docket No. 237). Defendants shall file an answer within 20 days of the filing date of this order. **The Court will hold a case management conference on January 22, 2010 at 3:00 pm.**

**IT IS SO ORDERED.**

Dated: October 13, 2009

SUSAN ILLSTON
United States District Judge